807 F.2d 1243
 John LELSZ, et al., Individually and on behalf of all others
similarly situated, Plaintiffs-Appellees,
v.
John J. KAVANAGH, M.D., et al., Defendants-Appellants,
and
Parent Association For the Retarded of Texas, Intervenor-Appellant.
John LELSZ, By and Through his parents and guardians, Mr.
and Mrs. John LELSZ, et al., Plaintiffs-Appellees,
v.
John J. KAVANAGH, M.D., Individually and as Supt. of Denton
State School, and his successors in office,
Defendant-Appellant,
and
PARENTS ASSOCIATION FOR THE RETARDED OF TEXAS, Intervenor-Appellant,
v.
ASSOCIATION FOR RETARDED CITIZENS OF TEXAS and Advocacy,
Inc., Intervenors- Appellees.
 Nos. 85-2485, 86-1166.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 21, 1987.
 
 Paul Smith, Joel I. Klein, Washington, D.C., Toni Hunter, Asst. Atty. Gen., Austin, Tex., for Parents Ass'n.
 Philip Durst, Austin, Tex., for Kavanagh, et al.
 David Ferleger, Barbara Hoffman, Philadelphia, Pa., for Lelsz.
 Janice L. Green, Austin, Tex., for Association for Retarded Citizens.
 Diane Shisk, Austin, Tex., for Advocacy, Inc.
 Appeals from the United States District Court for the Eastern District of Texas.
 Appeal from the United States District Court for the Northern District of Texas.
 Before WISDOM, DAVIS, and JONES, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 This saga began in 1974 when a class action was filed against officials of the Texas Department of Mental Health and Mental Retardation (MHMR)[1] alleging widespread abuses of mentally retarded patients and advocating their habilitation in the "least restrictive alternative" setting as a minimum standard of care. Simultaneously, a class represented by the same counsel were pursuing the same relief in Pennsylvania. The fortunes of the class in Texas waxed and have now waned according to the fate of the Pennsylvania litigation. Pennhurst State School v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). (Pennhurst II ).[2] In this appeal, we VACATE the district court's order dated June 5, 1985, which purports to enforce a consent decree between the class and the State by requiring the State to furlough no less than 279 class members from institutional to "community care" centers by September 1, 1986. For reasons elaborated upon below, the district court was without jurisdiction to award such state-law-based relief.
 
 I. PROCEDURAL HISTORY
 
 2
 The class certified by the district court comprised approximately 2,400 residents of the Austin, Denton and Fort Worth state schools for the mentally retarded, representing approximately 26% of the "clients" of the State's thirteen institutional centers which care for the mentally retarded. In May, 1983, following at least two years of negotiations, a consent decree (the "Resolution and Settlement" or "R & S") was worked out between the parties. After giving appropriate notice and conducting an extensive hearing, the trial court approved the R & S. The court issued a lengthy opinion outlining the background of and legal basis for the consent decree. Order of July 21, 1983. The R & S is 21 pages long, consisting of 45 paragraphs of both specific and general guidelines and directives for the improvement of treatment of the mentally retarded.[3]
 
 
 3
 The R & S set no timetable for developing community treatment centers, nor did it require the State to do more than exert its "best efforts" to provide such centers. Despite the lack of a timetable, the class representatives determined to press state officials for creation of community care centers by filing a "Motion for Community Placement" in February, 1985, less than two years after the R & S was entered. The motion requested that 779 class members, nearly one-third of those housed in the three state schools, be transferred immediately into the community. According to the class representatives, such a measure was necessary to fulfill the R & S. Further, the class contended that individualized habilitation profiles prepared for the class members by an interdisciplinary team of experts selected pursuant to the R & S reflected that 279 members of the class would be best served by transfer to community facilities. The State responded that it was in good faith complying with the R & S. Specifically, it had developed a comprehensive plan whereby 900 individuals from the thirteen state schools would be placed into community facilities during the 1985-87 biennium. Out of this figure, 300 were to come from the registry of those on waiting lists for the state schools. Obviously, a certain percentage of these statewide placements would be of class members, but the state was unable to estimate the number.
 
 
 4
 Following a hearing on the plaintiffs' motion, the district court ordered 279 class members to be transferred to community centers on or before September 1, 1986. Order of June 5, 1985. Because the individualized treatment profiles identified approximately 300 class members as suitable for community placement, and the State had at the time of the hearing neither so placed those individuals nor guaranteed their transfer, the court found the State in breach of the R & S. The court chastised the State for foot-dragging and delay in implementing community placement, and the court insisted that the "feasible" plan for such furloughs developed by an expert retained in consequence of the class action was more "convincing" than the rationale adduced by the State. In response to the State's argument that it could not discriminatorily favor class members over residents of other institutions when making community placements, the court concluded that "if defendants wish to see in the court's obligation to enforce the Resolution and Settlement as to class members the creation of a 'two-tier' system in Texas, they may so name it...." Record at 1084 (Vol. IV).[4] The court also by its own account "overrode" state law procedures detailing the rights of parents in the determination of community placement, and replaced that law with a complex scheme designed by a court-appointed attorney. The Order of June 5 is the principal subject of this appeal. The State also appeals the denial of its motion to modify the June 5 Order to obtain similar relief.
 
 
 5
 II. JURISDICTION TO ENTER THE JUNE 5, 1985 ORDER
 
 
 6
 The district court asserted that its Order of June 5 is based on "the inherent power possessed by federal courts to enforce agreements entered into in settlement of litigation." The district court summarized its view of its jurisdiction and authority to furlough specific numbers of mentally retarded patients as follows:
 
 
 7
 In sum, the Resolution and Settlement guarantees that class members will receive habilitation in the setting least restrictive of their liberty.... The defendants are not now meeting their obligations under the Resolution and Settlement.... The court has both the right and the duty to enforce the provisions of the Resolution and Settlement, as a matter of law and directly through the provisions of the Resolution and Settlement itself. Record at 1085-86 (Vol. IV).
 
 
 8
 There is a certain inconsistency in this language, which simultaneously suggests either that the R & S compels specific community placements, or that defendants' violation of the R & S enables the court to decree specific placements as a remedy. Appellees contend that the June 5 Order furthers the goals of the R & S "by requiring defendants to make a genuine effort to provide such [least restrictive alternative] services." The June 5 Order, in appellees' view, is a remedy to enforce the R & S, which, since it is not in conflict with constitutional law, federal statutes, or rights secured by state law, must be upheld.
 
 
 9
 We summarize our conclusions as follows. Whether the district court's Order of June 5 springs from legitimate enforcement of the R & S or as a court-created remedy for its violation is ultimately of no moment if the relief ordered, in effect, requires state officials to comply with state law. The Supreme Court's decision in Pennhurst II unequivocally held that, without a state's consent, the Eleventh Amendment denies jurisdiction over such an action to the federal courts, and the Court added that "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." Id. at 121, 104 S.Ct. at 919 (emphasis added).
 
 
 10
 The consent decree in this case was entered prior to, but in the shadow of, the grant of certioriari in Pennhurst II by the Supreme Court. The district court's Order of July 21, 1983, approving the decree painstakingly elicits the constitutional or statutory basis for relief afforded in every significant paragraph of the R & S. That order readily demonstrates that any rights the class members may have with regard to community placement were understood by the district court to originate in, and do in fact exist, in state law. Moreover, considerable case law authority rejects a federal constitutional right to treatment in a least restrictive alternative setting.[5] Because the State has not waived its Eleventh Amendment defense, and because only state law undergirds the Order of June 5, 1985, Pennhurst II precludes its enforcement to the extent of requiring the State to create community facilities for 279 class members. Finally, the fact that this order derives from a consent decree rather than from an order entered at the conclusion of litigation does not change our view of the case.
 
 
 11
 III. THE STATE LAW BASIS FOR PROVISIONS OF THE RESOLUTION AND SETTLEMENT
 
 
 12
 Juxtaposing paragraphs 7 and 8 of the Resolution and Settlement, on which the district court rested its Order of June 5, 1985, with applicable state law reflects the congruence between them.
 
 II. Obligations of Defendants
 
 13
 7. The defendants will provide to each member of the plaintiff class habilitation tailored to the person's individual needs. In meeting the habilitation needs of members of the plaintiff class, the individual's particular circumstances, including age, degree of retardation and handicapping conditions, will be taken into account. Habilitation is that education, training and care required by each plaintiff class member to improve and develop the person's level of social and intellectual functioning, designed to maximize skills and development and to enhance ability to cope with the environment, and provided in the setting which is least restrictive of the person's liberty. Defendants will provide habilitation services necessary to meet the needs of plaintiff class members until such time as they no longer require services under this Resolution and Settlement.
 
 
 14
 8. Defendants will provide each member of the plaintiff class with the least restrictive alternative living conditions possible consistent with the person's particular circumstances, including age, degree of retardation and handicapping conditions. Consistent with the person's capacities, each member of the plaintiff class will be taught adequate skills to help the person progress within the environment and to live as independently as possible. Services will be offered with utmost regard for the class member's dignity and personal autonomy.
 
 
 15
 Record at 179 (Vol. I).
 
 
 16
 Tex.Rev.Civ.Stat.Ann. art. 5547-203 Sec. 3.01A (Vernon Supp.1986) provides:
 
 
 17
 Community centers created pursuant to this Act are intended to be vital components in a continuum of services for the mentally ill and mentally retarded individuals of this state. It is the policy of this state that community centers strive to develop services for the mentally ill and mentally retarded that are effective alternatives to treatment in large residential facilities.
 
 
 18
 Tex.Rev.Civ.Stat.Ann. art. 5547-300 Sec. 15 (Vernon Supp.1986) provides:
 
 
 19
 Each client shall have the right to live in the least restrictive habilitation setting appropriate to the individual's needs and be treated and served in the least intrusive manner appropriate to the individual's needs.
 
 
 20
 Recognizing the decisive impact of the foregoing state law, the July 21, 1983 district court Order approving the Resolution and Settlement states more than once that paragraphs 7 and 8 are governed by state law.[6] The district court observed that "each of these provisions [of the R & S] effectuates rights explicitly protected by Texas law (if not implicitly by federal law), including those provisions concerning individual service plans and 'least restrictive alternative' living arrangements...." Record at 205 (Vol. I). The court noted that, "[a]lthough more detailed and far-reaching rights--including the right to habilitation in the least restrictive alternative living arrangement--have been located by district courts in the federal constitution and federal law, in this case it is likely that all such relief could and would have been predicated upon the more explicit Texas statutes. Tex.Rev.Civ.Stat.Ann. art. 5547-300 et. seq." Record at 215 (Vol. I) (citations omitted). As the district court recognized, state law confers on the class members, and on all other residents of state institutions for the mentally retarded, the right to live in the least restrictive setting. Because this is the right recognized in the Resolution and Settlement and enforced in the court's Order of June 5, 1985, that order plainly contravenes Pennhurst II unless some constitutional or federal right requires similar relief.[7]
 
 
 21
 IV. THE CONSTITUTIONAL STANDARD OF CARE FOR THE MENTALLY RETARDED
 
 
 22
 The district court's uncertainty about the scope of federal support for a least restrictive environment was not misplaced. Appellees suggest, as a threshold matter, that the existence of a generalized "constitutional right" to community services for institutionalized mentally retarded people is not at issue before this Court. On the other hand, they contend that the constitutionally-based rights to enjoy safe conditions and to be free from harm, the right to be free from unnecessary institutionalization, and to have commitment bear some reasonable relation to its purpose are coextensive with the rights conferred in paragraphs 7 and 8 of the Resolution and Settlement. The distinction appellees seek to draw eludes us. Appellees are aware that the Supreme Court cases they cite do not cut such a swath.[8] In fact, the lower court cases on which appellees rely for their due process argument are precisely those which have considered, and uniformly rejected, a constitutionally-founded right to receive treatment in the least restrictive alternative setting.[9]
 
 
 23
 In Society for Good Will to Retarded Children v. Cuomo, 737 F.2d 1239 (2d Cir.1984), the court stated, "we may consider only whether there is an entitlement to community placement or a 'least restrictive environment' under the federal Constitution. We hold that there is no such entitlement." Id. at 1248. The Second Circuit based its decision on the holding of Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), which confirmed the state's duty under the Fourteenth Amendment to provide adequate food, shelter, clothing, reasonable safety, and such training as "an appropriate professional would consider reasonable to ensure [a person's] safety and to facilitate his ability to function free from bodily restraints." Id. at 324, 102 S.Ct. at 2462. Youngberg also held that in determining whether the state has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323, 102 S.Ct. at 2462. The constitutional minimum standard of habilitation thus relates, not to the qualitative betterment of a retarded person's life, but only to the training necessary to afford him safety and freedom from bodily restraint. Whether that training is adequate must be determined in light of expert testimony; no constitutional violation exists unless the level of training is such a substantial departure from accepted professional judgment or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.
 
 
 24
 Reinforcing this view of Youngberg is Society for Good Will, supra, which further stated that "we may not look to whether the trial testimony established the superiority of a 'least restrictive environment' in general or of community placement in particular. Instead, we may rule only on whether a decision to keep residents at SDC [Suffolk Developmental Center] is a rational decision based on professional judgment." Society for Good Will, 737 F.2d at 1249. The court in Society for Good Will therefore concluded that while experts disagreed on the appropriateness of institutionalization, retaining residents at the institution did not violate the professional judgment standard enunciated in Youngberg. Other courts have agreed with this conclusion. See Rennie v. Klein, 720 F.2d 266 (3d Cir.1983); Phillips v. Thompson, 715 F.2d 365, 368 (7th Cir.1983); Ass'n for Retarded Citizens of North Dakota v. Olson, 561 F.Supp. 473, 486 (D.N.D.1982), aff'd on other grounds, 713 F.2d 1384 (8th Cir.1983); Garrity v. Gallen, 522 F.Supp. 171, 237-39 (D.N.H.1981).
 
 
 25
 Appellees would distinguish Society for Good Will with the suggestion that the district court there ordered wholesale transfer of patients from an institution to community facilities, irrespective of individualized professional treatment recommendations. This observation is only partially correct. The Second Circuit noted that the number of placements ordered by the district court was virtually irreconcilable with the profound retardation of the majority of the institution's patients. On the other hand, the Second Circuit criticized the district court's willingness to substitute the judgment of plaintiffs' experts for that of the state's experts, in contravention of Youngberg. Critically, appellees' focus on the individual optimum habilitation plans misperceives the real issue, which was articulated by Society for Good Will, following Youngberg. The real issue is whether the existing level of habilitation represents a gross and unwarranted departure from the minimum standard necessary to preserve an individual's safety and freedom from physical restraint. Appellees' evidence in support of community placement in the district court concerned the optimum habilitation of each class member rather than the constitutional minimum standard. There is no evidence in the record concerning whether the State, at the time of the hearing leading to the June 5, 1985 Order, was denying class members the constitutional minimum standard. Moreover, the appellees never requested enforcement of the R & S to correct alleged failures to adequately protect clients from abuse or neglect or to remedy alleged inadequacies in adaptive equipment for physical therapy. The court never ordered any remedial action to improve these areas of care. No effort was made by any party to the Joint Motion for Community Placement, the expert consultant, or the district court to affect a substantive level of care, only its locale.
 
 
 26
 It is also worthwhile to observe that should the optimum standard of habilitation afforded class members by state law become coextensive with federal constitutional requirements, the emphasis of Youngberg on the judgment of the State's professionals will be thoroughly undermined. The constitutional standard in that instance would be determined by the views of expert witnesses, and outside consultants could effectively overrule state programs, contrary to Youngberg. While Youngberg may eventually have to be squared with the duty of a state to prevent deterioration of skills of the retarded committed to its institutions (see Youngberg, 457 U.S. at 327-29, 102 S.Ct. at 2464-65 (Blackmun, J. concurring)) this is by no means the same as requiring the State to provide the best care possible or the optimum location to improve the client's physical, mental and emotional conditions. As the Second Circuit aptly noted in Society for Good Will, the due process clause only forbids deprivations of liberty without due process of law. "Where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no constitutional obligation to grant." Society for Good Will, 737 F.2d at 1250.
 
 
 27
 It is therefore our conclusion that the federal constitution does not confer on these class members a right to habilitation in the least restrictive environment. There being no constitutional scope to paragraphs 7 and 8 of the R & S, the district court's decree purporting to enforce them may not rest on that authority and is unauthorized.[10]
 
 
 28
 V. ENFORCEMENT OF THE R & S AS A CONSENT DECREE
 
 
 29
 The remaining issue is whether the district court may enforce the consent decree beyond the guarantees contained in the federal Constitution and laws simply because it is a consent decree.
 
 
 30
 Appellees argue, as best we can decipher, that because the Order of June 5, 1985, is remedial in nature and for the purpose of enforcing a consent decree, the origin of the protected right is not at issue. The order may be enforced as long as it is not inconsistent with federal constitutional or statutory law. Appellees would draw support from Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland, --- U.S. ----, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) for the proposition that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." Id. at ----, 106 S.Ct. at 3077. This argument founders on several grounds.
 
 
 31
 First, appellees interpret Firefighters v. City of Cleveland far too broadly. For one thing, that case emphasizes that "a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction." Id. If the court has no jurisdiction, as a result of the application of the Eleventh Amendment through Pennhurst II, Firefighters v. City of Cleveland does not apply. Additionally, Cleveland addressed the entry of a consent decree and held that the parties' agreement could result in a decree whose terms would exceed the court's remedial authority under a governing statute. It does not enlarge the court's latitude to issue its own, different order enforcing or modifying the decree, for in that case we presume the court must fall back on its inherent jurisdiction. The Court in Cleveland cited Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) with approval of the proposition that in modifying a consent decree, the court may not act inconsistently with the underlying statute. Cleveland, --- U.S. at ----, 106 S.Ct. at 3078-79.
 
 
 32
 Second, appellees' argument cannot be reconciled with the rejection in Pennhurst II of pendent jurisdiction, a judge-made doctrine, to validate the exercise of authority over state law claims. The Court stated that "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." Pennhurst II, 465 U.S. at 121, 104 S.Ct. at 919 (emphasis added). Pennhurst II thus would prevent a federal court from exercising remedial authority in any form if the award of such relief against a nonconsenting state is based on a state law claim.
 
 
 33
 Third, the right/remedy distinction urged by appellees inevitably collides with the principles of federalism and comity which animate the Eleventh Amendment and Pennhurst II. The restriction upon the federal courts' jurisdiction over suits against a nonconsenting state government implements our system of dual sovereignty. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Pennhurst II, 465 U.S. at 106, 104 S.Ct. at 911. Therefore, the only legitimate basis for federal court intervention, consistent with the Eleventh Amendment is the vindication of federal rights. If a federal court remedy unfounded in federal law intrudes into the governance of matters otherwise presided over by the states, no federal right has been vindicated. The right and remedy are not severable--in terms of the principle behind the Eleventh Amendment, they go hand in hand.[11]
 
 
 34
 In this case, as has been demonstrated, paragraphs 7 and 8 of the Resolution and Settlement closely track the Texas statute defining standards of habilitation for the state's mentally retarded citizens.[12] No comparable federal right to a "least restrictive alternative" environment exists. When the court chose to enforce the decree by requiring furlough of patients to community centers, however, this state-law-right, according to appellees' theory, suddenly mutated into a federal remedy which appellees deem to be inviolable.[13] Not only does the right-remedy distinction clash with Pennhurst II, but on a more fundamental level, it gives consent decrees a life of their own virtually outside the law. If, as appellees argue, a federal court may take almost any action against a state to enforce a consent decree so long as it is "consistent with" the "spirit" of the applicable constitutional law and the decree itself, there is no limitation on the scope of the court's power. Lack of restraint on an organ of government (even the judiciary) is the antithesis of law.
 
 
 35
 Appellees contend that in reality the Eleventh Amendment defense asserted by the State is a red herring, because the State (a) failed to raise it at the hearing preceding the June 5 Order, (b) consented to the decree from which the June 5 Order springs, and (c) alternatively, waived the Eleventh Amendment defense by virtue of legislative appropriations designed to comply with the Resolution and Settlement. We reject these contentions.
 
 
 36
 Because the Eleventh Amendment deprives a federal court of jurisdiction over a controversy in which a state is sued on a non-consenting state law claim, and the issue may be raised even for the first time on appeal. Pennhurst II, 465 U.S. at 99 n. 8, 104 S.Ct. at 907 n. 8; Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Ford Motor Co. v. Dept. of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). The Eleventh Amendment defense was, in any event, not obscured from the district court, because its order approving the Resolution and Settlement noted that the State had raised that defense. (Record at 216 (Vol. I)).
 
 
 37
 It is further incorrect to suggest that the State in effect consented to suit and thus waived the Eleventh Amendment defense. Waiver of a state's sovereign immunity, like waiver of any constitutional right, is strictly construed in favor of the holder of the right. Pennhurst II, 465 U.S. at 99, 104 S.Ct. at 907; see Edelman v. Jordan, 415 U.S. at 673, 94 S.Ct. at 1360-61. Consent to suit against the State in federal court must be unequivocally expressed. Pennhurst II, 465 U.S. at 99, 104 S.Ct. at 907. The State's original consent to the settlement with appellees must be viewed in the context of then-existing law. In 1983, pre-Pennhurst II, it was assumed that a federal court had jurisdiction over pendent state law-based claims. Texas state officials could not knowingly and intentionally waive Eleventh Amendment protection because at the time of the settlement they did not know they possessed that defense.[14]
 
 
 38
 Moreover, the Supreme Court has held that a consent decree must be modified to adjust to changes in governing law. System Federation No. 91 v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961). Like the Second Circuit, addressing a proposed modification of a consent decree following the Supreme Court decision in Youngberg v. Romeo, "[w]e can see no reason for a different view when the requirement is constitutional and a subsequent decision of the Court has made clear that the court entering the decree interpreted the requirement too broadly." New York State Ass'n for Retarded Children v. Carey, 706 F.2d 956, 971 (2d Cir.1983), cert. denied, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). The implications of Pennhurst II on the consent decree itself therefore had to be considered by the district court and could not be waived by the State. By the same token, legislative appropriations to comply with a consent decree cannot be seen as a waiver of the Eleventh Amendment defense. That the State felt it must comply with a court order, until that order should be modified or superseded, hardly binds its hands to take advantage of a favorable change in the law regarding that order. "The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation in events to be." United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).
 
 
 39
 Appellees' argument that the State consented to suit in federal court on the matter of community placements, and thus impliedly consented to the June 5 Order, rests, in part, on an assumption that the Resolution and Settlement requires such placements. The district court likewise found that the general guarantee in the R & S that class members must be furnished the least restrictive alternative living conditions equated with community-based placement. Interpreting the Resolution and Settlement "within its four corners," United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), as we must, we find no such requirement. On its face, the R & S sets no goals or timetables for placement of the retarded into community facilities. Its goal for individual care is to provide habilitation in a setting "least restrictive of individual liberty" and to provide each member of the class the "least restrictive alternative living conditions possible...." Nothing in these two key paragraphs compels the State to set up community facilities.[15] Indeed, the State's only obligation is to use "best efforts to overcome all obstacles and barriers to the creation of facilities and programs for habilitation outside the institution...." Record at 180 (Vol. I) (R & S, p 9). The R & S permits "[a] variety of residences [to] be used or adapted for each plaintiff class member regardless of degree of disability," Record at 184 (Vol. I) (R & S, p 17), and it forbids the relocation of a class member from an institution to a non-institutional residential program "unless such program will offer ... a better opportunity for personal development and a more suitable living environment." Record at 184 (Vol. I) (R & S, p 19). It prohibits services received by "any person, whether or not a member of the plaintiff class," to be reduced by the Resolution and Settlement. Record at 187 (Vol. I) (R & S, p 30). Finally, it recognizes that the Texas legislature is not bound by the Resolution and Settlement to appropriate funds. Record at 187 (Vol. I) (R & S, p 31). It should be noted that defendant's "obligations" under the R & S are reflected in no fewer than 18 paragraphs of the R & S; paragraphs 7 and 8 constitute only a small part of the duties imposed on the State.
 
 
 40
 Ignoring the "best efforts" provision, the district court focused on paragraphs 7 and 8 of the Resolution and Settlement. It failed to consider other constraints imposed by the Resolution and Settlement on the State's provision of care, which recognized the need for realistic trade-offs between the goals declared in paragraphs 7 and 8 and the other quality standards mandated by the Settlement. To the district court, paragraphs 7 and 8 erroneously became an independently enforceable guarantee to the class rather than one among a constellation of reforms toward which the state was required to progress. Review of the Resolution and Settlement as a whole, however, contradicts the district court's conclusion that it mandates community placement.
 
 
 41
 Lest there be any doubt that the Resolution and Settlement did not specifically require community placements, the district court itself referred to the limited nature of such relief in its July 1983 Order approving the Resolution and Settlement. The district court commented that, "only" paragraphs 9, 17, and 19 "specifically refer to community residential facilities." Record at 205 (Vol. I). It observed that PART's concerns about wholesale parolling of the mentally retarded into inadequate local facilities should be mollified by the phrase "to the greatest extent possible" in the definition of habilitation. Record at 223 (Vol. I).[16] The court also noted the objection of one group to the R & S on the ground that it failed to provide a timetable for complete de-institutionalization. Record at 220 (Vol. I). None of these contemporaneous observations limiting the scope of the Resolution and Settlement can be reconciled with the district court's subsequent embrace of the theory that it requires expedited community placement efforts. To the extent that the State consented in the R & S to support habilitation in the least restrictive setting, our construction of the R & S leads us to conclude that it did so only because the R & S tracked the requirements of state law and because such a setting must be provided only if this could be done consistent with other standards of care mandated by the Resolution and Settlement. The State did not consent to a federal court's usurpation of the decision when and how to effect community placements.
 
 
 42
 For the foregoing reasons, we conclude that the district court was without jurisdiction to enforce the R & S or remedy any violation thereof by ordering the State to make community placements of class members. Because the court could not award this relief, its concomitant wholesale revision of state procedures governing parents' participation in community placement decisions is unnecessary and therefore likewise unenforceable. Finally, given our disposition of the Order of June 5, 1985, we find it unnecessary to consider revising or modifying that Order to prevent enforcement of any provisions grounded in state law or to prevent entry of any order for community placements.
 
 
 43
 The judgment of the district court is VACATED and the case REMANDED for further proceedings not inconsistent herewith.
 
 WISDOM, Circuit Judge, dissenting:
 
 44
 I agree with the majority's vacating the order of the district court. I would remand the case, however, for a hearing to determine whether the defendants have satisfied the Fourteenth Amendment criteria established in Youngberg as the minimum standards for the care of the mentally retarded.
 
 
 45
 I disagree with the majority's expansive view of the Eleventh Amendment and of Pennhurst II. The coexistence of similar federal and state rights and remedies does not deprive a federal court of jurisdiction. The plaintiffs brought the action in the federal court, alleging deprivation of their Fourteenth Amendment rights. As early as its order of May 13, 1983, the district court stated:
 
 
 46
 The central focus of this case is the right of plaintiffs to safe conditions and to be free from harm, and the right to be free from unnecessary institutionalization. Also, the nature and duration of commitment must bear some reasonable relation to its purpose. The court recognizes the existence of the these rights under the Fourteenth Amendment of the United States Constitution.
 
 
 47
 Order of May 13, 1983 (filed May 19, 1983), at 2-3. In its order of October 3, 1984, the district court again said:
 
 
 48
 Lelsz v. Kavanagh was brought under the Fourteenth Amendment to the Constitution, and the court's primary obligation in this case is to enforce the Constitution.
 
 
 49
 The Eleventh Amendment enjoys no exalted position over the Fourteenth. If the plaintiffs have not had a full and fair hearing on their federal rights, they are entitled to one. The decision of the majority deprives them of a hearing on their federal claim.
 
 
 
 [1]
 Although individual defendants were named, the class sought reform of three state institutions and this opinion will refer to defendants generically as the State. Also participating on behalf of the State is the Parent Association for the Retarded of Texas (PART), which represents parents of mentally retarded people who do not share the plaintiffs' views. PART was permitted to intervene during and after the hearing on the R & S. Prior to that time, PART's efforts to participate in the litigation were rebuffed. See Lelsz v. Kavanaugh, 710 F.2d 1040 (5th Cir.1983)
 
 
 [2]
 A more detailed history of the relief sought in Pennsylvania may be found in Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 6, 101 S.Ct. 1531, 1534, 67 L.Ed.2d 694 (1981) (Pennhurst I.)
 
 
 [3]
 On one hand, the R & S provides at paragraph 22 that clients will be guaranteed a living area free of insects and bad odors. On the general level, paragraphs 25 and 26 require quarterly reports to be filed with the court by the defendants and require general counsultation between defendants and representatives of the class
 
 
 [4]
 By its order, the district court re-allocated the $12.1 million appropriated by the Texas Legislature to create community placements for the clients of all thirteen state schools. Testimony of J. Fincannon, April 11, 1985, Record at 1030-31, 1040-42 (Vol. XVII); See, Affidavit of G. Miller, Record at 1254-1261 (Vol. V). The district court recognized that this sum was allocated to minimize the staff-to-patient ratios within all the state schools (Record at 1068-70 (Vol. IV)) and was sufficient to make approximately 300 placements, per year, state wide. One must conclude that the district court knew that its order requiring such re-allocation of funds would disadvantage non-class residents of state schools
 
 
 [5]
 The three Circuits that have addressed this issue have all held that there is no constitutional or federal right to community placement, or care or treatment in the least restrictive environment. Clark v. Cohen, 794 F.2d 79, 93 n. 9 (3d Cir.1986) (en banc) (Becker, J., concurring); Society for Good Will to Retarded Children v. Cuomo, 737 F.2d 1239, 1249 (2d Cir.1984); Rennie v. Klein, 720 F.2d 266, 268-69 (3d Cir.1983); Phillips v. Thompson, 715 F.2d 365, 368 (7th Cir.1983)
 The Supreme Court also declined to adopt the "least intrusive" alternative analysis when it defined the liberty interests of the mentally retarded who are under state care and control. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).
 
 
 [6]
 The district court's heavy reliance on Texas law as its justification for approving and enforcing the R & S (especially those provisions in the R & S addressing community placements and least restrictive alternatives) is found throughout its Order of July 21, 1983 granting final approval of the R & S:
 
 
 [1]
 "[T]he obligations created by the R & S have their bases in federal and state constitutional and statutory law.... The only right of plaintiffs explicitly attributed by the settlement to the fourteenth amendment to the United States Constitution is the 'right to safety and protection from harm'...." Record at 201 (Vol. I) (cites omitted) (emphasis added)
 
 
 [2]
 "The first paragraph of the settlement also states certain principles of policy and, perhaps, philosophy, that the parties acknowledge and which appear to be elaborations upon or paraphrases of existing state law." Record at 201 (Vol. I)
 
 
 [3]
 "These statements [principles articulated in p 1 of the R & S] are consistent with existing state legislative policy as articulated in the Texas Mentally Retarded Persons Act...." (quoting Tex.Rev.Civ.Stat.Ann. art. 5547-300, Sec. 2(a)-(b). Record at 202 (Vol. I)
 
 
 [4]
 "The necessity of supplementing institutional care with community residential facilities is explicitly established by Texas law...." (quoting Tex.Rev.Civ.Stat.Ann. art. 5547-203, Sec. 3.01(A). Record at 206 (Vol I)
 
 
 [5]
 "Both the plaintiffs and defendants agree that the continuum of services envisioned by Texas law and, perhaps, by federal law has not yet become a reality in Texas...." Record at 222 (Vol. I)
 
 
 [6]
 The principle [of normalization] has been accepted by the Texas Legislature in the Mentally Retarded Persons Act of 1977." Record at 223 (Vol. I)
 
 
 [7]
 The failure to create additional community services "would violate state and, probably, federal law. Record at 226 (Vol. I)
 Significantly, the district court, in its July, 1983 Order approving the R & S, quoted paragraphs 7 and 8 of the R & S together with Tex.Rev.Civ.Stat.Ann. arts. 5547-300, Secs. 3(23), 7, 15, 37(b) (Vernon Supp.1986).
 
 
 [7]
 The district court recognized the potential problems it could encounter by attempting to enforce the State's laws. The July 21, 1983 Memorandum Opinion contains several references which reflect the district court's concern over a possible Eleventh Amendment claim by the State. For example:
 
 
 [1]
 "[A] case of this kind inevitably presents formidable legal questions concerning federalism--the limits to which a federal court may properly intervene in the affairs of a state institution...." Record at 211 (Vol. I)
 
 
 [2]
 "Defendants were prepared to argue that a federal court was debarred either by the eleventh amendment or by 'abstention' principles from ordering the relief sought under state law. Although both of these arguments were rejected under similar circumstances by the en banc Court of Appeals for the Third Circuit, Halderman [v. Pennhurst State School ], 673 F.2d , 656-659, the Supreme Court has subsequently granted a writ of certiorari, [457 U.S. 1311, 102 S.Ct. 2956, 73 L.Ed.2d 1348] 50 U.S.L.W. 3993 (U.S. June 21, 1982)." Record at 216. (Vol. I)
 
 
 [8]
 The Supreme Court cases relied upon by the appellees do not support the alleged relationship between community placements and the class members' rights to safety, freedom from bodily restraint, and minimally adequate habilitation. For example, the appellees have relied upon the landmark case of Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) in an attempt to transform the state right of a least restrictive environment into a federal right. The Supreme Court, however, refused to adopt the "least intrusive means" approach which had been relied upon by the Court of Appeals in its opinion in Youngberg (Romeo v. Youngberg, 644 F.2d 147 (3d Cir.1980) (en banc) (See also Rennie v. Klein, 720 F.2d 266, 268 (3d Cir.1983))
 Another case, Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), is cited by appellees for the proposition that the mentally ill have a right to be free from unnecessary institutionalization. In Parham the issue under consideration involved possible procedural due process violations resulting from a state's procedures for the commitment of minors. Parham had nothing to do with an individual's right to be confined in the least restrictive environment.
 Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979) also concerned the alleged failure of a state to satisfy procedural due process requirements for the commitment of the mentally ill and mentally retarded. Appellees cite the case as support for the need of professional review prior to commitment. We do not disagree with the appellee's suggestion. However, neither the case nor the appellees' view of it persuades us that a federal right exists to community placement.
 Finally, the appellees look to another Supreme Court case that addresses unacceptable commitment and review procedures for incompetent criminal defendants. Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). Again, we find nothing in the case which would sway us toward appellees' view that the case supports a "least intrusive means" analysis. It merely holds that the nature and duration of a civil commitment must bear some reasonable relationship to the purpose for the confinement.
 
 
 [9]
 The appellees look to two cases, in particular, to support their argument favoring a constitutionally-founded right to receive treatment in the least restrictive alternative setting. In the first case, Clark v. Cohen, 794 F.2d 79 (3d Cir.1986), the Third Circuit entered an order directing the state to develop a program of community services for a mildly retarded individual who had been confined to an institution for 28 years without the benefit of procedural due process. This case differs from the facts now under consideration since the Third Circuit was "dealing with a plaintiff who was committed without notice or hearing as a result of a petition containing an incorrect diagnosis, and who was retained against her will without a hearing for over 28 years." Id. at 86
 Clark was an individual case where the only method to remedy the effects of the unconstitutional confinement was community placement. In other words, community placement was not merely the best remedy for the plaintiff but the only remedy. The Third Circuit did not grant carte blanche, a constitutional right to community placement. Judge Becker in his concurrence noted that the Third Circuit had previously held in Rennie v. Klein, 720 F.2d 266 (3d Cir.1983) (en banc) that a right to habilitation did not include the least restrictive alternative theory. Clark, 494 F.2d at 93 n. 9 (Becker, J. concurring).
 As in Clark, Thomas S. v. Morrow, 781 F.2d 367 (4th Cir.1986) dealt with an individual situation where the plaintiff was found to be on the borderline between average intelligence and mild mental retardation. Thomas S. had the potential to live independently of the state's care, but was unable to live independently without minimal habilitation which involved a community setting. This community habilitation was not "better" care but the only way in which the state could remedy its past transgressions against Thomas S. At one point, he had been lodged in a night care unit operated in conjunction with a drug detoxification center (Thomas S. had no drug problems) which was incompatible with the treatment prescribed for him. At other points, he had been placed in a rest home that housed elderly and emotionally ill adults. Thomas S. was the only young person residing at this rest home.
 
 
 [10]
 Appellees also contend that the federal Constitution entitles them to enforce guarantees which are created by state law, and in this case the statutes pertaining to conditions of habilitation. This issue has been disposed against appellees' contentions in Stern v. Tarrant County Hosp. Dist., 778 F.2d 1052, 1059 (5th Cir.1985) (en banc), cert. denied, --- U.S. ----, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986)
 
 
 [11]
 In a similar vein, it is established that a court's remedy for violating a consent decree may not go outside the decree itself or governing statutory law. Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Further, in Washington v. Penwell, 700 F.2d 570 (9th Cir.1983), the court refused to enforce against a state a consent decree provision that exceeded the bounds of constitutional requirements. Circuit courts have also freely modified injunctive decrees against public entities that were framed to fit constitutional decisions which later mitigated the State's burdens. Newman v. Graddick, 740 F.2d 1513, 1521 (11th Cir.1984) (modification to permit double-bunking of jail inmates following Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)); Nelson v. Collins, 659 F.2d 420, 425 (4th Cir.1981) (same). The remedy in Newman and Nelson was retailored to fit the revised scope of the right. These courts have recognized that a federal court's remedial jurisdiction is coextensive with and no greater than the scope of the right being protected
 
 
 [12]
 Tex.Rev.Civ.Stat.Ann. art. 5547-203 Sec. 3.01A and 5547-300 Secs. 2(b), 3(23), 7, 15, 37(b)(3)
 
 
 [13]
 This need not suggest a recurrent issue because, post-Pennhurst II, "A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." Pennhurst II, 465 U.S. at 121, 104 S.Ct. at 919. Future cases and decrees will be more clearly framed. See, e.g., New York Ass'n for Retarded Children v. Carey, 706 F.2d 956 (2d Cir.1983), cert. denied, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983)
 
 
 [14]
 See Hospital Ass'n of New York State, Inc. v. Toia, 577 F.2d 790 (2d Cir.1978), holding that state could withdraw consent to suit, rendering federal court thereafter without jurisdiction, when Congress retroactively repealed law requiring state to waive 11th Amendment immunity to participate in Medicaid
 
 
 [15]
 The term "least restrictive alternative" care is both ambiguous and provocative. To the extent it is equated with small-scale community facilities, there is vigorous professional debate over whether such facilities are ipso facto "less restrictive" than an institution which contains wheelchair-accessible educational, recreational, living and shopping facilities in a compact area. See, e.g., R. Miller, "The Least Restrictive Alternative: Hidden Meanings and Agendas," 8 Comm. Mental Health J. 46 (Spring 1982); New York State Ass'n for Retarded Children v. Carey, 706 F.2d at 971 n. 19 (2d Cir.1983); Pennhurst I, 451 U.S. at 25, 101 S.Ct. at 1543-44. The relevant Texas statutes obviously intend to provide least restrictive alternative care within a continuum of state-sponsored facilities, which logically could range from schools and community-based homes to state institutions with varying degrees of accessibility to the world at large. Tex.Rev.Civ.Stat.Ann. art. 5547-203 Sec. 3.01A and 5547-300 Sec. 15 (Vernon Supp.1986)
 
 
 [16]
 PART rightly notes the cruel irony to which its members would be subjected if the R & S were construed to require community placements. PART was not allowed to intervene during litigation and negotiation of the R & S, it vehemently objected to any language that could mandate community placements, and as of the July 21, 1983 Order approving the R & S, it felt that the State, the appellees, and the district court had promised no such mandate existed