**Melvin BALDRIDGE, et al., Plaintiffs,**

v.

**Bill CLINTON, Individually and in his Official Capacity as Governor of the State of Arkansas, et al., Defendants.**

**No. LR–C–83–1004.**

United States District Court,
E.D. Arkansas, W.D.

Nov. 24, 1987.

Griffin J. Stockley, Central Arkansas Legal Services, Little Rock, Ark., for plaintiffs.

Debby Thetford Nye, General Counsel, R.B. Friedlander, Sp. Counsel to the Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM AND ORDER

HENRY WOODS, District Judge.

On October 5, 1987, the court held an evidentiary hearing on the plaintiffs' May 1 and May 26, 1987, motions for contempt, in which the plaintiffs alleged the defendants to be in violation of the March 12, 1987, consent decree entered herein and the court's order of May 23, 1985, respectively. For the reasons that follow, these motions are denied.

## I. BACKGROUND

This case was filed in November, 1983, as a class action on behalf of patients confined at the Arkansas State Hospital, residents of the Human Development Centers (HDC), and residents of the Benton Services Center (BSC). The complaint was brought pursuant to 42 U.S.C. § 1983, to redress alleged deprivations of rights secured by the First, Eighth and Fourteenth Amendments to the United States Constitution,[1] and pursuant to 29 U.S.C. § 794 and 42 U.S.C. § 1396d(c). It alleged that the Department of Human Services (DHS), and its divisions of Mental Health (DMH) and Developmental Disabilities Services (DDS), failed to provide adequate treatment, training and appropriate placement for certain individuals within its institutions. Both declaratory and injunctive relief were prayed for.

A class was certified and defined to include the named plaintiffs and all other institutionalized persons who now, or in the future, are in the custody of the DHS, including DMH and DDS, and who have been identified by appropriate professionals as receiving inadequate treatment, care and/or training, or being inappropriately placed. The parties stipulated to the relevant facts on May 18, 1984, and on January 17, 1985, they entered into a consent order. That order was based in part on the stipulations (1) that some of the named plaintiffs were identified by appropriate professionals as requiring services and training in a behavioral disorder unit, and (2) that a certain number of residents within the institutions had been identified by qualified professionals as requiring different placements and services.

As a method of resolving the plaintiffs' claims, the defendants agreed to employ Dr. John Marr, a psychologist at the University of Arkansas, to review the adequacy of DMH treatment and the DDS training

---

1. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), holds that all involuntary residents of state-operated institutions for the mentally retarded possess constitutionally protected liberty interests guaranteed by the due process clause of the 14th Amendment. *See also Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552 (1980); *Mills v. Rogers,* 457 U.S. 291, 298–302, 102 S.Ct. 2442, 2447–50, 73 L.Ed.2d 16 (1982); *Lelsz v. Kavanagh,* 807 F.2d 1243, 1249–51 (5th Cir. 1987), *reh'g denied en banc,* 815 F.2d 1034 (5th Cir.1987).

plan developed for day service, habilitation and training for developmentally disabled individuals residing in the Arkansas State Hospital. Dr. Marr was also to review the final survey report of the Health Care Financing Administration to be received by DDS for the purpose of determining the appropriateness of services and programs for mentally retarded persons residing at BSC, and to evaluate the need for a special treatment unit (STU) for women. Following these reviews Dr. Marr filed his report with the court.

On May 23, 1985, the court entered an order which endorsed the comprehensive recommendations in Dr. Marr's Report and required the defendants to incorporate those recommendations into their plans. That order also required that Dr. Marr be retained for at least one additional year to monitor the defendants' progress and report to the court on a quarterly basis. In Dr. Marr's fourth quarterly report, dated July 1, 1986, he found that, to date, only three of his original fourteen recommendations had been fulfilled. It was this conclusion which prompted the plaintiffs to file their first motion for contempt, on which a hearing was set for March 16, 1987. That hearing did not take place, however, because on March 12, 1987, the parties entered into a second consent decree which is the subject of the present motion for contempt.

In the March 12, 1987, order the defendants agreed to take the steps necessary to bring themselves into compliance with Dr. Marr's recommendations, and by implication with the court's May 23, 1985, order. Specifically, the defendants agreed to:

(1) immediately request the 76th Arkansas General Assembly to appropriate sufficient funds for construction or renovation of Rogers Hall;

(2) request immediately the 76th Arkansas General Assembly to amend the proper appropriation bill(s) to allow DHS to hire psychologists (L 124) at a special entry rate of Grade 23, Step 8; and

(3) request immediately the 76th Arkansas General Assembly to amend the proper appropriation bill(s) to allow DHS to hire, at an increase of two grade levels, employees classified as MR Aide Trainee, MR Aide I and II, MR Aide Supervisor, Mental Health Aide and MH Worker.

The order further provided that Dr. Marr was to continue to monitor each of the six areas stated therein[2] and report to the court on a semiannual basis.

The plaintiffs now move the court to hold the defendants in contempt for their alleged failure to comply with the terms of the May 23, 1985, order requiring them to implement Dr. Marr's recommendations, and the March 12, 1987, order setting forth the steps to be taken toward achievement of that goal. The motion alleges that the Arkansas Legislature failed to fund the Rogers Hall project and to increase salaries of direct care personnel and psychologists as described in the consent decree. The plaintiffs argue that because of these failures the defendants are unable to provide adequate treatment, training and care. The defendants respond that they agreed to take certain steps in the March 12, 1987, consent order and that they have fully complied with its provisions.

## II. DISCUSSION

To prevail on their motion for civil contempt, the plaintiffs must prove with clear and convincing evidence that the defendants have failed to use reasonable energy and diligence to comply with a clear and unambiguous court order. *EEOC v. Local 28 of Sheet Metal Workers International Association,* 753 F.2d 1172 (2nd Cir.1985), *cert. granted,* 474 U.S. 815, 106 S.Ct. 58, 88 L.Ed.2d 47 (1985), *aff'd,* —— U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). The scope of the consent order at issue here must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). It must be construed

---

**2.** See, *infra,* under the heading "Conclusion."

as it is written, and not as it might have been written had the plaintiffs established their factual claims and legal theories in litigation. *Id.* 402 U.S. at 682, 91 S.Ct. at 1757. The consent order sets forth three specific affirmative acts which were to be performed by the defendants. Each will be discussed in turn.

First, under the terms of the consent order, the defendants were to "immediately request" the Arkansas Legislature to appropriate funds for the renovation of Rogers Hall. At the outset the court notes that the language used by the parties in their drafting of the consent order, which is very specific, requires only that a request be made. It does not require that the defendants' request be granted. The court must now determine whether the clause in question, as interpreted, has been complied with by the defendant.

Herman Harley, Deputy Director of Mental Health, testified that the inadequacies of Rogers Hall have been brought to the attention of every General Assembly for the last ten years. He further testified that, pursuant to the consent order, twelve million dollars ($12 million) was requested from the 76th General Assembly, of which five million dollars ($5 million) was actually appropriated. Harley related that the appropriation for Rogers Hall was placed in "category 'B'" by the Legislature and has not yet been funded. Bill Goodman, Assistant Director for Research and Fiscal Services, Bureau of Legislative Research of the Arkansas Legislative Council, testified that money for the Rogers Hall appropriation must come from the General Improvement Fund and that, within that fund, the Governor has no authority to release "B" funds until all of "category 'A'" has been funded. In response to the court's question, Goodman conceded that no "category 'B'" projects were likely to be funded this biennium.

■ Thus, although there will be no funding for the much needed renovation of Rogers Hall, the court cannot conclude that the defendants failed to comply with the agreed terms of the March 12, 1987 order. They agreed only to request funding from the Arkansas Legislature and that agreement was honored.

■ The defendants' second obligation under the March 12, 1987, order was to "immediately request" the Arkansas Legislature to amend appropriation bills to allow DHS to hire psychologists at a special entry rate of Grade 23, Step 8. The evidence at the hearing showed that this provision was fully complied with, in that the request was made and approved.

Anita Curtis, Deputy Director of the Division of Management Services within DHS, testified that, on the advice of the Legislative Personnel Committee, the special rate of compensation for psychologists was reduced to Grade 23, Step 5 statewide, but for DHS and MH the psychologist's salary will be paid at Step 8. No evidence was introduced to rebut this testimony, although Dr. Marr did take issue with the initial decision to set the entry rate at such a high step rather than seeking an entry rate starting at a lower step within a higher grade. Dr. Marr's objections go to the substance of the agreement, however, and not to its interpretation which is, at this point, all the court is concerned with.

■ Finally, the defendants were to "request immediately" that the Arkansas Legislature amend the proper appropriation bills to allow DHS to hire direct care employees classified as MR Aide Trainee, MR Aide I and II, MR Aide Supervisor, Mental Health Aide and MH Worker, all at an increase of two grade levels. Anne Majure, Deputy Director for the Division of Developmental Disability Services testified that she was not sure why the above classifications were singled out, because they were only one segment of people in the Human Development Centers that were in direct contact with clients, but stated that a salary increase for the specified classifications had already been implemented. She testified that the increase implemented was a two-step increase, rather than a two-grade increase as requested, because DHS was bound by the provisions of the Classification Compensation Act established by the legislature. Further testimony indicated that it was the Legislative Personnel Com-

mittee's determination that the two-grade increase was not appropriate.

Based on the testimony summarized above, the court finds that the defendants have complied with the provision of the March 12, 1987, consent order requiring them to request a two-grade salary increase for the enumerated classes of direct-care employees. Again, Dr. Marr took issue with the decision to limit the increases to the enumerated classes, but that criticism does not affect the court's interpretation of the agreed language of the order.

## III. CONCLUSION

The defendants have fully complied with the agreed terms of the March 12, 1987, consent order which, by implication, superceded the May 23, 1985, order requiring the defendants to implement Dr. Marr's recommendations. Accordingly, the court finds that the plaintiffs' motion for contempt should be, and is hereby ordered denied.

Notwithstanding the court's finding that the defendants are not in contempt, there remain severe and disturbing problems with regard to inadequate care, treatment, training and placement of the plaintiff class. Dr. Marr, the court-appointed expert agreed to by the parties, testified that he was not consulted in a meaningful way by either party prior to the negotiation, drafting or submission of the March 12, 1987, consent order to the court. He further testified that the terms of the order were inconsistent with his earlier recommendations. The court finds this to be inexcusable.

Dr. Marr's report to the court dated September 25, 1987, which was received in evidence and is incorporated herein by reference, discusses: (1) the existing needs of dually-diagnosed clients (those having emotional problems and requiring habilitation, training and services) at Rogers Hall; (2) the inadequate therapeutic environment at Rogers Hall, including both the physical structure and staff-provided services; (3) problems of high turnover and low morale of direct care and professional staff associated with inadequate compensation, and the dangerous climate created thereby; (4) the lack of an alternative programming policy to the locked facility model; (5) inadequacy of the referral process policy of women requiring an STU program; and (6) continuing problems in the delivery of adequate treatment and services for patients at Rogers Hall, Benton Services Center and the Human Development Centers.

Dr. Marr's report concludes with the following statement and recommendations:

DDS and DMHS central offices are caught between the proverbial rock and a hard place. They are told there is no more money available from above but that they better make sure that their institutions and services receive favorable evaluations from Federal Inspection Teams and Class Action Monitors. Yet there is no way to adequately treat, train, or provide services to the persons under their care with the money available. Innovative planning and provision of services must be suspended while they attempt to mask the tragedy that is taking place.

It is recommended that:

1. This fiscal year every full-time employee who delivers treatment, training, or services to clients or who supervises and trains direct care employees receive an increase in compensation that is competitive with the marketplace. No person who supervises these persons should receive less money than those they supervise.

2. This fiscal year the number of positions necessary to adequately treat, train, or care for clients who have behavioral problems be increased and the number of supervisors and professionals who supervise those positions be increased.

3. The construction funds necessary for Rogers Hall be obtained this fiscal year.

4. A behaviorally trained psychologist be appointed to coordinate services for dually-diagnosed clients at Rogers Hall.

5. The Agreement between DMHS and DDS concerning dually-diagnosed clients at Rogers Hall be revised,

a. To include a provision for monitoring by a qualified team within DHS.

b. To include a provision that dually-diagnosed clients will begin receiving services for each diagnosed need within 30 days of their dual diagnosis.

6. The treatment and programming policy as an alternative to the STU model be developed by DHS (Section IV) and a copy submitted to me before January, 1988.

7. Until such an alternative is approved and in operation, the STU at Alexander HDC and ITP at Warren HDC be staffed so that they can deliver adequate services to clients in those units.

8. That the Referral Policy for admission to the STU and ITP be followed in all cases.

9. That psychologists receive a Grade increase equivalent to the step increase requested by the State in the last Legislative Session.

■ While the court agrees with Dr. Marr that the fundamental problem is lack of money and not the defendants' lack of good-faith efforts, the court also recognizes that what is appropriate care, treatment and placement must be determined by a qualified professional based upon medical and psychological criteria, not upon what resources are available. *Lelsz v. Kavanagh,* 824 F.2d 372 (5th Cir.1987) (*citing Clark v. Cohen,* 613 F.Supp. 684, 704 N. 13 (E.D.Penn.1985)). The obligation of the defendants to eliminate existing unconstitutionalities cannot depend upon what the Governor or the Legislature may do. Rather, if Arkansas is going to operate a state hospital system, it is going to have to be one countenanced by the constitution of the United States. *Welsch v. Likins,* 550 F.2d 1122 (8th Cir.1977); *Holt v. Sarver,* 309 F.Supp. 362, 385 (E.D.Ark.1970), *aff'd,* 442 F.2d 304 (8th Cir.1971) (Henley, C.J., addressing conditions of the Arkansas Prison System).

■ Dr. Marr has concluded, and the court agrees, that treatment, care and placement decisions within DMH are controlled by the availability of funding (or lack thereof) and not by professional judgment. Moreover, his assessment of the quality and availability of care and treatment leads the court to believe that the plaintiff class is being deprived of minimal constitutional liberties. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1262–64, 63 L.Ed.2d 552 (1980); *Mills v. Rogers,* 457 U.S. 291, 298–302 (1982); *Lelsz v. Kavanagh,* 807 F.2d 1243, 1249–51 (5th Cir. 1987), *reh'g denied en banc,* 815 F.2d 1034. The Eighth Circuit has held that lack of funds or facilities cannot justify lack of competent medical care for prison inmates. *Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir.1974). *See also Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir. 1968) (humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations....). Neither should lack of funding be available as an excuse for the defendants' failure to provide the plaintiff class, who through no fault of their own are clients of the state hospital system, with minimally adequate care, treatment and placement.

■ Accordingly, the consent order of March 12, 1987, is hereby ordered vacated. The parties are directed to consult with Dr. Marr for the purpose of formulating a plan to implement the recommnendations contained in his September 25, 1987, report to the court. A proposed plan shall be drafted by the plaintiffs, with the assistance and counsel of Dr. Marr, and served upon the defendants within sixty (60) days of this order. The defendants' objections are to be served on the plaintiffs within the thirty (30) days following service. An additional thirty (30) days shall be granted during which time the parties, with the counsel of Dr. Marr, shall attempt to reach an agreement on contested issues. At the expiration of that time the proposed plan shall be submitted to the court for ruling.