Patricia WELSCH, et al., Plaintiffs,

v.

Sandra S. GARDEBRING, et al., Defendants.

Civ. No. 4–72–451.

United States District Court,
D. Minnesota,
Fourth Division.

July 31, 1987.
Supplemental Opinion Aug. 26, 1987.

Luther A. Granquist, Legal Aid Society of Minneapolis, Minneapolis, Minn., Anne L. Henry, for plaintiffs.

Maureen Bellis, Office of the Atty. Gen., St. Paul, Minn., Beverly Jones Heydinger, Asst. Atty. Gen., for defendant.

Foster & Jensen, Thomas H. Jensen, Minneapolis, Minn., for Association of Counties.

## ORDER

DOTY, District Judge.

This action was commenced in 1972 by six mentally retarded residents of Minnesota state hospitals against the Commissioner of Public Welfare[1] of the State of Minnesota and the administrators of six of the Minnesota state hospitals providing services for persons with mental retardation. The plaintiffs claimed that their rights under the due process clause of the fourteenth amendment to the United States Constitution were abridged because they were not receiving a minimal level of care and because they were committed to state institutions rather than being provided care and treatment in less restrictive community alternatives.

On April 15, 1974, plaintiffs obtained certification of a class consisting of judicially committed mentally retarded residents at Brainerd, Cambridge, Faribault, Fergus Falls, Hastings and Moose Lake State Hospitals. The class was expanded on August 15, 1980, to include judicially committed mentally retarded residents at St. Peter, Rochester and Willmar State Hospitals.[2]

State hospitals are now called regional treatment centers or RTCs. Approximately 1,650 mentally retarded persons currently reside in RTCs and approximately 800–1,000 persons were discharged from the RTCs since 1980.

The matter currently before the Court is a request for approval of a Negotiated Settlement between plaintiffs and defendants pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The Court has studied the Negotiated Settlement in its entirety, and after holding a hearing, believes it is a fair, adequate and reasonable resolution of the dispute between the parties. *See Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Accordingly, it is approved.

## I. FACTS

### A. Procedure

Initially this action focused on Cambridge State Hospital and resulted in orders of this Court in 1974 and 1976 as well as of the Court of Appeals in 1977. *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn.1974); *Welsh v. Likins,* Civ. No. 4–72–451 (D.Minn. April 15, 1976); *Welsh v. Likins,* Civ. No. 4–72–451 (D.Minn. July 28, 1976); *Welsch v. Likins,* 550 F.2d 1122 (8th Cir. 1977). In December, 1977, the parties negotiated a Consent Decree which applied to that facility.

After completing a portion of a trial in 1980 regarding four other state hospitals caring for persons with mental retardation, the parties again agreed to a Consent Decree which was approved by this Court in September, 1980. By agreement of the parties, that Decree was applicable to all eight of the state hospitals with residents having mental retardation. That Decree provided, among other things, for reduction in the state hospital population from 2650 to 1850 by July 1, 1987, for specified staff-

---

**1.** Pursuant to 1984 Minn. Laws c. 654, the Department of Welfare has been renamed and is now the Department of Human Services.

**2.** At this time the state hospitals at Hastings and Rochester are closed and Lake Owasso is no longer operated by the State of Minnesota.

ing ratios, for procedures governing the use of major tranquilizers and certain behavior management practices, for discharge planning and evaluation, and for the appointment of a monitor to review compliance with the Decree, to report to this Court with respect to compliance, and to resolve complaints about non-compliance with the Decree through a procedure which culminated in review of the monitor's findings and recommendations by this Court.

Paragraph 111 of the 1980 Consent Decree provided that the Court's jurisdiction over this action would end on July 1, 1987 "if the defendants have substantially complied with the terms of this Decree." By agreement of the parties, that paragraph was amended by an order dated April 14, 1987 to provide that the Court would maintain jurisdiction until September 30, 1987, and that the defendant Commissioner would continue payment of the monitor through that date.

In lieu of the adjudication of the question whether there has been substantial compliance with the Consent Decree, the parties submitted a Negotiated Settlement dated April 14, 1987, to the Court. The Settlement was premised, in part, on passage of legislation which provides for review through the state administrative and judicial system of case management services provided persons with mental retardation. That legislation was approved on May 14, 1987.

The Negotiated Settlement the defendant Commissioner of Human Services[3] to undertake specified actions prior to the dismissal of this action, and continues the monitor position for a limited period of time for the purpose of reviewing the quality of services provided in the regional treatment centers and in the community facilities and programs to which persons with mental retardation have been discharged since September 15, 1980.

Pursuant to an Order of this Court dated April 14, 1987, notice was provided to persons presently residing in those portions of the RTCs which serve persons with mental retardation and to those persons discharged from those facilities since September 15, 1980. A hearing was held on June 5, 1987, at which time public testimony was received regarding the proposed action by this Court.

### B. The History of the Negotiated Settlement

In the fall of 1986, when counsel for both parties met to discuss the Department's compliance with the 1980 Consent Decree, further litigation seemed to be a certainty. Plaintiffs' counsel contended that the Department failed to comply with the Decree in several substantial respects. The Department disagreed and further argued that the federal court's authority to enforce remedies for the Department's alleged non-compliance was significantly curtailed in light of the United States Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

Circumstances arose however, delaying the resolution of pretrial issues and the trial itself. In October 1986, this Court notified the parties that a pending proceeding, involving important issues indicative of the Department's compliance with the Consent Decree, would not be resolved by the end of the year. That proceeding, known as the Hearthside Homes proceeding, involved the scope of the Department's duty to supervise community based services to mentally retarded persons. Counsel for both sides believed that resolution of that proceeding was necessary before litigation over the Department's compliance with the 1980 Consent Degree would proceed.

In January 1987, the parties were notified that this case had been transferred to the undersigned Judge, who was yet to be appointed. That transfer further delayed the resolution of the Hearthside Homes proceeding. Additionally, it precluded the resolution of several pretrial issues, includ-

---

**3.** Throughout the Court's discussion, the defendant, Commissioner of Human Services is referred to as "the Department."

ing the relief which could be afforded by the federal court.

In the face of that delay, the parties were confronted with the fact that the 1980 Consent Decree was effective through June 30, 1987, and that its status after that time was uncertain. In light of those circumstances, the parties met in February 1987, and determined that settlement discussions would be fruitful. Negotiations were carried on virtually around the clock through the month of March, so that legislative changes necessary to a settlement agreement, could be initiated prior to the end of the legislative session. Numerous persons and groups were consulted during the negotiation of the Settlement Agreement, including legislators, attorneys, representatives of county human services agencies, representatives of the Minnesota Congress for Advocates for the Retarded, parent groups and persons previously involved in the litigation.

## C. The Negotiated Settlement

The reported purpose of the Negotiated Settlement is to provide policies and procedures which give assurance that mentally retarded persons will receive quality services. It also has a secondary purpose, which is to replace the 1980 Consent Decree with a document containing well defined, measurable goals, which if attained, will provide the basis for the Court to terminate its jurisdiction over the case.

The Negotiated Settlement was predicated on the passage of state legislation enabling persons dissatisfied with the human services provided them by the county to appeal their dispute. Under the 1980 Consent Decree, the Court monitor addressed disputes over the quality of care to individuals.[4] This procedure had problems. Pursuant to Minn. Stat. § 256B.092 (1986), enacted in 1983, the county case manager, and not the Commissioner of the Department of Human Services, plans and monitors individualized services. The county, however, is not a party to the Decree, and cannot be compelled to act by the court monitor.

On May 14, 1987, 1987 Minn. Laws c. 148 became effective. Review under the appeals procedure provided by that legislation expands the review provided by the court monitor under the 1980 Consent Decree to include review of a county's actions. Further, there is established a legislated standard of review. The appeals process in significant part, replaces the oversight of the federal court and the court monitor. Disputes arising after approval of this Settlement will be resolved through the state judicial system.

The main provisions of the Negotiated Settlement are as follows:

1. No RTC will be licensed to serve children, defined as persons younger than 18 years of age. Children with mental retardation will be admitted to an RTC only in very limited circumstances.

2. The staff ratios agreed upon in the 1980 Consent Decree will be maintained at the RTCs.

3. The Department will issue a report describing the training which was offered by it to its Licensing Division staff, the RTC staff, community provider staff and county case managers.

4. The Department will issue·summaries of its efforts to improve the quality of physical therapy services at RTCs, and of psychotropic medication use in each of the RTCs. It will also develop a protocol to

---

4. Under the terms of the 1980 Consent Decree, a court monitor was appointed to serve as "a neutral officer of the Court." The monitor received reports and investigated matters involving the Department's non-compliance with the 1980 Decree. If he determined that the Department was not in compliance with the Consent Decree, a notice of non-compliance was sent to all interested parties. Resolution of the matter was attempted first through an informal meeting of the parties. If this was unsuccessful, the parties met formally with the monitor. If a formal meeting did not result in a resolution of the matter, the monitor or a qualified hearing officer conducted an evidentiary hearing and based on this hearing, the monitor submitted recommendations regarding appropriate corrective action to the Court. These recommendations could be implemented upon motion of either party or the Court. Paragraph 95 of the 1980 Consent Decree.

monitor the side-effects of psychotropic medications for persons in RTCs.

5. The Department will prepare a protocol for the review of individual habilitation plans (IHPs) for persons in RTCs with special needs, defined as persons who are blind, deaf, or have severe physical handicaps or behavior management problems, and will review a specified number of such plans. It will also prepare a protocol to evaluate the community service needs of persons in RTCs with special needs, and will use such protocol to review the specificity of such persons' community needs assessments.

6. The Department will develop a protocol for review of an individual service plan created for a person to be discharged from an RTC. The protocol must specify that the discharge planning team will:

(a) review the capability of community service providers;

(b) review the process leading to the development of an IHP;

(c) determine that the proposed community services are adequate; and

(d) authorize any member of the discharge planning team to seek review from the Department's Mental Retardation Division when he believes the proposed discharge should not take place.

The protocol must also specify that the county case manager will submit a written evaluation to the appropriate RTC, within 60 days of a person's discharge, analyzing whether the dischargee's IHP is being fully implemented.

7. The Department will either discharge 100 persons, or 25% of the total number of persons with mental retardation discharged from July 1, 1987, through June 30, 1989, whichever is less, who are very physically handicapped, deaf, or have severe behavior problems. The parents and guardians of these dischargees may object to the discharge and appeal the placement decision under Minnesota law.

8. The Department will conduct on-site reviews of licensed programs that have been issued notices of non-compliance with the provisions of the 1980 Consent Decree, if such notices are currently outstanding.

9. The Department will conduct field reviews of services to 250 persons with mental retardation.

10. The Department will issue a report of the adequacy of case management services provided in light of the caseload size of case managers.

11. The Department will submit for publication certain rules governing residential services to mentally retarded persons and concerning the licensing of individuals or agencies providing certain services to mentally retarded persons.

12. A monitor will review and issue reports and recommendations regarding the quality of services provided in RTCs and licensed residential programs. The monitor may publish such reports and recommendations. The monitor will not oversee compliance with the Agreement and will not recommend decisions in individual cases.

13. Counsel for plaintiffs will have reasonable access to the buildings and grounds and pertinent records of persons with mental retardation at RTCs and state operated community facilities.

The Settlement provides that the Court's jurisdiction over this matter will terminate, upon motion of either or both parties, if the Department has completed certain obligations generally described above.

**D. Subject Matter Jurisdiction**

■ The Court's subject matter jurisdiction to approve the Settlement has been questioned in light of the Supreme Court's decision in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) and the Fifth Circuit's decision in *Lelsz v. Kavanagh,* 807 F.2d 1243 (5th Cir.1987). In *Pennhurst,* a class of mentally retarded persons sued the Pennsylvania Department of Public Welfare and various state and county officials, among others, for violations of their alleged constitutional and federal and state statutory rights to adequate habilitation while residing at Pennhurst, an

institution for the care of the mentally retarded. The Supreme Court held that with respect to the class state rights, the eleventh amendment barred the federal court from ordering the state to conform its actions to state law. In *Lelsz,* a similar case brought in Texas, the Fifth Circuit construed *Pennhurst* to encompass a prohibition of a federal court's enforcement of a consent decree based on state law. *Lelsz v. Kavanagh,* 807 F.2d 1243 (5th Cir.1987).

The Court believes that its approval of the Settlement does not run afoul of the eleventh amendment. It is not at all clear that this Settlement rests on state law. The parties state that they went to great lengths to avoid basing their Settlement on state law provisions. The Court's review of the Settlement and the statutory enactments regarding the care of the mentally retarded, reveals that the specific relief provided in the Settlement does not clearly exist in state law. *See* Minn.Stat. §§ 252, 252A, 253B, 256 (1986). Further, the Settlement serves to resolve a dispute concerning the plaintiff class' constitutional rights. Such a dispute is clearly within the Court's subject matter jurisdiction. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

The Court's approval of the Settlement is not inconsistent with the *Lelsz* decision. The *Lelsz* court found that "[t]he district court's Order of July 21, 1983, approving the decree painstakingly elicit[ed] the constitutional or statutory basis for relief afforded in every significant paragraph of the [Resolution and Settlement]. That order readily demonstrate[d] that any rights the class members may have [had] with regard to community placement were understood by the district court to originate in, and d[id] in fact exist, in state law." *Lelsz* 807 F.2d at 1247. The Fifth Circuit determined that the district court effectively was ordering state officials to comply with state law and because of the eleventh amendment, was without subject matter jurisdiction to issue such an Order.

Moreover, the Court finds in this case, that it is the parties' voluntary agreement, and not federal or state law, that provides this Court's authority for approving the Settlement. *See Local Number 93 v. City of Cleveland,* — U.S. ——, 106 S.Ct. 3063, 3076, 92 L.Ed.2d 405 (1986). In *City of Cleveland,* Section 706(g) of Title VII precluded the Federal District Court from imposing certain forms of race-conscious relief after trial. The Supreme Court found however, that this provision did not preclude the Federal District Court from entering a consent decree in which such relief was awarded. The Court stated that the "voluntary nature of a consent decree is its most fundamental characteristic. Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." *City of Cleveland,* — U.S. ——, 106 S.Ct. at 3075, 3076, 92 L.Ed.2d 405.

The Court's approval of the Settlement in this case, is in contrast to the district court action in *Lelsz.* There the court was not approving the parties' voluntary agreement, but was fashioning and enforcing a remedy for non-compliance with the Decree, which was not clearly authorized by the terms of the Decree. According to the Fifth Circuit, the district court was not relying on the agreement of the parties for its authority to act, but was relying on state law.

Based on the above, the Court finds that it has subject matter jurisdiction to approve the parties Negotiated Settlement.

## II. DISCUSSION OF THE FAIRNESS, ADEQUACY AND REASONABLENESS OF THE NEGOTIATED SETTLEMENT.

Rule 23(e) of the Federal Rules of Civil Procedure provides that "[a] class action shall not be dismissed or compromised without the approval of the Court." The Court's approval is necessary to ensure that the interests of absent class members as well as the interests of the named plaintiffs, have been protected. The district court is a fiduciary of the rights of these absent members. *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975).

 However, in acting to protect the interests of the class when reviewing a settlement, the Court cannot rewrite or

modify the terms of the agreement. *In Re Warner Communications,* 798 F.2d 35, 37 (2nd Cir.1986). The Settlement must be approved or disapproved as a whole. *Officers for Justice v. Civil Service Commission, Etc.,* 688 F.2d 615, 630 (9th Cir.1982).

To afford protection to all class members, the Court must be convinced that the Settlement is fair, adequate and reasonable, before finally approving it. *Halderman v. Pennhurst State School and Hospital,* 610 F.Supp. 1221, 1230 (E.D.Penn. 1986). *Grunin,* 513 F.2d at 123. The parties seeking the Court's approval have the burden of convincing the Court by a preponderance of the evidence that the Settlement meets this standard. *In re General Motors Corp. Engine Interchange,* 594 F.2d 1106, 1126 n. 30 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979).

To determine whether the Negotiated Settlement is fair, adequate and reasonable, the Court has been instructed to consider several factors:

(1) the reasonableness of the Settlement in light of all attendant risks of litigation;

(2) the expense, likely duration and complexity of litigation;

(3) the opinions of the representatives of class members, class counsel and class representatives; and

(4) the extent of discovery completed and the stage of the proceedings.

*Grunin,* 513 F.2d at 124; *Halderman v. Pennhurst,* 610 F.Supp. at 1230. Each of these factors will be considered below.

A. Reasonableness of the Settlement In Light of the Attendant Risks Litigation

Plaintiffs and the Department agree that some provisions of the 1980 Consent Decree have clearly been met. The population reduction requirements of paragraphs Twelve, Fourteen, and Fifteen of the Decree were satisfied. Plaintiffs also agreed that the Department complied with paragraphs Seventeen through Twenty of the Decree, pertaining to the admission and discharge of children from RTCs. How-

ever, the parties strongly disagree as to whether the Department complied with three basic areas of the 1980 Consent Decree: paragraph Thirteen, regarding the Department's obligation to place mentally retarded persons in the community without discriminating against those who are severely afflicted; paragraphs Twenty-two, Twenty-four, and Twenty-six, regarding the Department's obligation to supervise the quality of services provided mentally retarded persons discharged from an RTC and placed into the Community; and paragraph Sixty-three, regarding the Department's obligation to provide each resident in an RTC with an adequate individualized habilitation plan and program of training to meet his individual needs.

The parties disagreement as to the Department's compliance with these paragraphs would have been the focus of litigation. Accordingly, the Court assessed the benefits that plaintiffs received under the Settlement, with regard to these paragraphs, in light of the risks involved in going to trial.

In making its assessment, the Court did not attempt to try the case. "The very purpose of compromise is to avoid the delay and expense of ... trial." *Grunin,* 513 F.2d at 124. A court's determination generally will not go beyond "an amalgam of delicate balancing, gross approximation, and rough justice." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468 (2nd Cir.1974). In this case, because neither litigation nor final pretrial matters had commenced, the Court's determinations are necessarily based on approximations.

The Court finds that plaintiffs' case, while strong in many respects, has significant weaknesses. If this case goes to trial, plaintiffs face substantial risks. The Court also finds that the Settlement incorporates several mechanisms to assure that mentally retarded persons receive quality service. In light of this, the Court finds the Negotiated Settlement reasonable.

*Paragraph Thirteen:*

This paragraph provides that:

No identifiable group of state hospital residents, such as physically handicapped person or persons with severe behavior problems, shall be excluded from the community placement efforts required to meet the population reduction requirements. The defendant shall not be required to meet any quota of placements among such identifiable groups.

The plaintiffs' evidence of the Department's non-compliance with this paragraph does not appear to be strong. It is based in part on the court monitor's data which shows large discrepancies between the rate of the discharge of persons with severe problems and the remaining residents at the institutions. *Sixth Report of the Court Monitor,* at 30, 33 (Dec. 1986). Based on its findings, the court monitor issued notices of non-compliance to three state institutions. The Department objects to plaintiffs' data on the basis that it is invalid and in direct contradiction to the Department's data. Further, the Department contends that plaintiffs are relying on quotas to determine that the Department has not complied with this paragraph. Because the language of the provision specifies that the Department is not required to meet any quotas of community placements regarding the specified group, a substantial question exists as to whether plaintiffs could establish that the Department did not comply with this paragraph.

In light of this circumstance, the relief obtained by plaintiffs appears to be significant. Approximately 550 mentally retarded persons who are severely physically handicapped, deaf, or who have severe behavior problems currently reside in the RTCs. Pursuant to Part IX E of the Negotiated Settlement, at least 100 persons or 25% of the total number of persons discharged from July 1, 1987, to June 30, 1989, whichever is less, must be from this group. Such a requirement ensures that mentally retarded persons with severe problems are not excluded from community placement.

This provision caused the greatest concern among representatives of class members, thus, its reasonableness will be further evaluated in light of their comments in Section C below.

*Paragraphs Twenty-Two, Twenty-Four and Twenty-Six*

These paragraphs provide in relevant part that:

22. The parties acknowledge that Minnesota law places the responsibility for establishing a continuing plan of aftercare services upon the counties. Accordingly, prior to a resident's discharge from an institution, the county social worker, in cooperation with the resident, the parents or guardian, community service providers and the interdisciplinary team shall formulate a discharge plan which includes, but is not limited to, the following provisions;

a. The type of residential setting in which the resident shall be placed;

b. The type of developmental or work programs ... which will be provided to the resident;

c. An individual habilitation plan consistent with Department of Public Welfare Rule 185 to be implemented when the resident is placed in the community placement;

d. The scope of supportive services which shall be provided to meet the resident's needs ...

e. Within 60 days after placement the county social worker shall visit the resident in the community placement ... to assess whether she or he is being provided the programs and services required by the discharge plan....

24. Persons discharged from state institutions shall be placed in community programs which approximately meet their individual needs....

26. All persons discharged from state institutions shall be provided with appropriate educational, developmental or work programs, such as public school, developmental achievement programs, work activity, sheltered work, or competitive employment.

During the past four years, plaintiffs have amassed a strong factual case showing that the Department did not comply with these paragraphs. Plaintiffs have

documented numerous examples of inadequate care given to mentally retarded persons residing at or attending community based facilities and programs. In August 1983, a non-compliance matter was tried involving eight class members residing at a residential facility, known as Hawthorne House, and attending a developmental achievement center known as Itasca DAC. In late 1984 and early 1985 a proceeding was begun over a non-compliance matter regarding class members at Hearthside Homes. This proceeding has not yet been completed. Non-compliance proceedings were scheduled regarding class members at Rainbow Residence, a facility in Owatonna, when the Settlement negotiations were undertaken. Further, a total of 13 notices of non-compliance were issued in 1987 with regard to several community programs or facilities.

Although the plaintiffs contend that the Department has failed in several respects to provide services designed to meet the individual needs of mentally retarded persons residing in the community, the Department contends that it has no ongoing duty to supervise the quality of services received by mentally retarded persons once they are discharged and placement evaluations are completed. At this time, the proper construction of paragraphs Twenty-two, Twenty-four and Twenty-six is unclear; thus, the scope of the Department's duty cannot be known. However, even if these paragraphs were finally determined to require the Department to supervise services to mentally retarded residents in community programs or facilities, the standard by which its compliance is to be measured is unclear. In 1982, the Supreme Court held that courts must defer to the judgment of qualified professionals in determining whether mentally retarded persons have been afforded their constitutional rights. *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). While the Department presumably would argue that the *Youngberg* standard should govern the review of their compliance with paragraphs Twenty-two, Twenty-four and Twenty-six, plaintiffs presumably would contend that the standard for review

should arise from the terms of the 1980 Consent Decree. Plaintiff's argument would result in a stricter standard of review. However, it would also necessitate resolution of the question of whether paragraphs Twenty-two, Twenty-four and Twenty-six are based on state law, and whether the Court, in fashioning a remedy would be forcing state officials to comply with state law in contravention of the eleventh amendment. Because of its basis in state law, Paragraph Twenty-two, Section C, requiring that an IHP consistent with Public Welfare Rule 185 be implemented when a resident is placed in the community, raises a significant question as to the relief plaintiffs could obtain under these paragraphs.

In light of the legal impediment plaintiffs face in trying to obtain relief from the Department's alleged non-compliance with paragraphs Twenty-two, Twenty-four and Twenty-six, the Court finds that the relief obtained by plaintiffs in the Negotiated Settlement is reasonable. Indeed, plaintiffs' counsel state that the Settlement incorporates the relief they sought, to a significant extent.

Under Part IX A of the Negotiated Settlement the Department will conduct on-site reviews of licensed programs for which there are outstanding notices of non-compliance and issue any necessary correction orders. While it is true that nothing more than a review is required, and further, that plaintiffs' counsel, and not parents and guardians, are to be given copies of correction orders, the Court believes that these weaknesses are not substantial. The Department has shown through its licensing reviews and probationary notices to RTCs that it is willing to police itself. Further, plaintiffs' counsel have extensively scrutinized services provided to mentally retarded persons and the Court is convinced that plaintiffs' counsel will continue to scrutinize the services provided to mentally retarded persons residing in the community.

Under Part IX D of the Negotiated Settlement the Department must conduct field reviews of 150 class members to determine if such persons are satisfied with the ser-

vices they are provided, and if such services conform to specific criteria. The Department will notify the county providing such services of any problems identified in the field reviews. As with the on-site reviews, the Settlement does not require that parents, relatives or guardians receive notice of any problems. As stated above, while this is a weakness, the Court believes it is not substantial in light of the clear willingness of plaintiffs' counsel to scrutinize services to mentally retarded persons and when considered along with the other safeguards provided.

Under Part V B, 7 of the Negotiated Settlement the Department must develop a protocol for review of a mentally retarded resident's IHP at the time of the discharge. This protocol must specify that the discharge planning team must review the capability of community providers, and that any member of the discharge planning team can seek review of any discharge decision believed to be inappropriate with the Department's Mental Retardation Division.

Under Part VIII of the Negotiated Settlement the Department will fund a monitor to report on and publish its findings on the quality of services provided persons residing at RTCs and at community facilities until legislation is enacted creating an external monitor, or until the Court's jurisdiction over this case is terminated. Although one monitor cannot review the services to 1,650 RTC residents and 800 or more community residents, the monitor's function is significant, as it provides for review of the quality of services provided to mentally retarded persons.

The adequacy of a placement is further assured by the availability of the appeals process for any parent or guardian dissatisfied with the placement. *See,* 1987 Minn. Laws c. 148.

The Department must also publish new licensing standards in the State Register.

*Paragraph Sixty-Three*

Paragraph Sixty-three provides that:

63. Each resident [in an RTC] must be provided with an individualized habilitation plan and programs of training and remedial services as specified in Department of Public Welfare Rule 34. [The licensing rule for residential facilities for persons with mental retardation, now codified as Minnesota Rules 9525.0210–9525.0430.] These plans shall be periodically reviewed, evaluated, and where necessary, altered to meet the current needs of the particular residents.

The plaintiffs appear to have substantial evidence of deficiencies in the formulation and implementation of IHPs for mentally retarded persons residing at RTCs. In late 1986 and early 1987, the court monitor issued to the Department notices that it had not complied with paragraph 63, as it had failed to develop minimally adequate habilitation plans and programs for several persons in three of the RTCs, and had failed to provide adequate physical therapy services at RTCs. The Department's Licensing Division conducted reviews of each of the RTC programs for persons with mental retardation in late 1986 and early 1987. Correction orders addressing weaknesses in the IHPs were issued for each facility. The programs at three facilities received probationary licenses.

In spite of plaintiffs' substantial evidence indicating problems in the Department's formulation and implementation of IHPs, the plaintiffs face difficulties in obtaining the relief they desire if their case goes to trial. Paragraph 63 clearly incorporates state law. Thus, the eleventh amendment may preclude this Court's implementation of much of the desired relief. Further, the Department will argue that to the extent the development and implementation of IHPs is based on professional judgment, the Supreme Court's decision in *Youngberg* will preclude review of the Department's actions.

In light of the strong legal arguments that the Department will present if the issue of compliance with paragraph 63 is litigated, the Court believes that the relief plaintiffs obtained under the Settlement is reasonable. Again, plaintiffs assert that they obtained much the same relief under the Settlement as they would have requested at trial.

The new appeals procedure is available for residents of RTCs dissatisfied with the services they receive just as it is for residents in community facilities. Further, the Department has agreed to take several actions to assure quality service to residents at RTCs. Pursuant to Parts V B, 1, 2, 3, 4, 5 and 6 of the Negotiated Settlement the Department will prepare a protocol for the review of IHPs for persons with special needs and review 200 of such plans, will prepare a protocol to evaluate the community service needs of persons in RTCs with special needs, will prepare reports on the provision of physical therapy services, will publish reports on psychotropic medication use and will develop a protocol to monitor the side-effects of psychotropic medications used by persons in RTCs. Also, as stated above, the Department will fund a monitor to report and publish its findings on the quality of services provided to persons residing in RTCs.

In sum, the Court believes that the Settlement appears to be reasonable in light of the risks of litigation.

B. Expenses, Likely Duration, and Complexity of Litigation

These factors favor the Court's approval of the Negotiated Settlement. The potential complexity of this case seems clear. The Department's compliance with the 1980 Consent Decree must be analyzed in terms of the services provided at seven institutions. Further, if plaintiffs prevail on their assertion that, under paragraphs Twenty-two, Twenty-four and Twenty-six of the 1980 Consent Decree, the Department must supervise the quality of services provided mentally retarded persons residing in or attending community programs and facilities, the Department's compliance with the Decree must be analyzed in terms of the quality of care provided to an additional 800 or more class members who have been discharged from the RTCs since 1980. The complexity of the facts in this case is clearly apparent by the volumes of documents and reports that have been developed or issued by the court monitor and the state and county facilities. If this case were tried, this enormous amount of information

would have to be studied and analyzed. Further investigations also would be necessary to document the Department's compliance or non-compliance with the 1980 Decree.

The legal issues in this case are also potentially complex in light of the Supreme Court's decisions in *Pennhurst* and *Youngberg*, and the 5th Circuit decision in *Lelsz*. Both the standards used to measure the Department's compliance with the 1980 Consent Decree, and the Court's authority to enforce requested relief, would be sharply disputed.

The amount of time required to prepare for trial and litigate this action to resolution, in light of the complexity of the facts and law of this case, appears to be substantial; therefore, this factor supports the Court's approval of the Settlement. Plaintiffs' counsel estimate that 6–8 months of full-time work would be necessary to prepare for trial. The trial itself is estimated to take 6 weeks. To the extent plaintiffs prevail at trial, actions to enforce the Department's compliance with the court's order are likely. If plaintiffs do not prevail on significant issues, it is very likely that they would appeal the case to the Eighth Circuit in light of the novel constitutional questions raised in this case.

One of the goals of the parties in entering into the Settlement was to end the Court's jurisdiction over this case. Having reviewed the Settlement, the Court believes that it provides for clear criteria, which if met, will end this Court's jurisdiction in two years. This Settlement provides some assurance that the Court's jurisdiction will end in the foreseeable future. If this case went to trial, the time at which the Court's jurisdiction would terminate is clearly uncertain.

The expense involved if this case were tried, also supports the Court's approval of the Settlement. Plaintiffs estimate that their out-of-pocket expenses would be $75,000–$100,000. Further, RTC staff and staff of community programs would probably spend thousands of hours in trial-related activities. Much time of both these staffs and the Department would be un-

available to provides services to the mentally retarded.

■ The Court recognizes, in spite of these concerns, that it should not approve an inadequate Settlement simply to conclude a complex, lengthy and expensive suit. *See Armstrong v. Board of School Directors, Etc.*, 616 F.2d 305, 327 (7th Cir. 1980). However, the Court is convinced that after balancing the complexity, duration, and expense of this case with the other factors it must consider, the relief afforded plaintiffs in the Negotiated Settlement warrants the Court's approval of the Settlement.

## C. The Opinions of Representatives of Class Members, Counsel, and Class Members

■ Counsel for the parties believe that the Settlement is in the best interests of plaintiffs and defendants and strongly urge the Court to approve the Settlement. The Court gives great weight to these opinions. It is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement. *See Cotton v. Hinton* 559 F.2d 1326, 1330 (5th Cir.1977); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1215 (5th Cir. 1978); *Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir.1983).

The Court, however, recognizes that it cannot merely rubber stamp the views of counsel, particularly in light of its fiduciary duty to act as guardian of the class. A potential conflict of interest always exists between an attorney and a class. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2nd Cir.1974). Accordingly, the Court has fully considered the views of representatives of class members and class members.

Notice of the Negotiated Settlement, Proposed Order and the June 5, 1987, fairness hearing was sent to the representatives of the 1,650 persons residing in the RTCs and to the representatives of most of the approximately 800–1,000 persons discharged from the RTCs since 1980. Approximately 80 persons submitted comments in writing to the Court and approxi-

mately 25 persons spoke at the June 5, 1987, hearing. Several of the persons who spoke at the hearing were among the 80 persons who submitted comments in writing. Many of the comments expressed fears, concerns or satisfaction with particular terms of the Settlement, while neither approving or disapproving the Settlement in its entirety. The Court made no attempt, therefore, to quantify the number of persons approving or disapproving of the Settlement. However, it notes that a substantial number of comments expressed approval for the Settlement. In particular, the Court found that no organization representing the interests of persons with mental retardation, with the exception of the Congress of Advocates for the Retarded, opposed the Settlement. The Association for Retarded Citizens, Minnesota; Association for Retarded Citizens, Hennepin; the West-Metro Chapter of the Society for Children and Adults with Autism; the Governor's Planning Council on Developmental Disabilities; and the Minnesota Association for Persons with Severe Handicaps, all spoke or wrote in support of the Settlement.

Persons expressing fears, apprehensions or disapproval of the terms of the Settlement overwhelmingly were concerned with Part IX E of the Negotiated Settlement providing for the discharge from RTCs and placement in a community program or facility, of a specified number of mentally retarded persons with severe physical or behavioral problems.

In particular, strong objections, by Mr. Melvin Heckt and Mr. Dean Thomas, fathers of a severely afflicted mentally retarded woman and man, respectively, residing at RTCs, were raised in writing and at the hearing concerning this provision of the agreement. Generally, Mr. Heckt and Mr. Thomas contended that the Settlement's requirement of a specified number of discharges, together with what they believed to be departmental and financial pressures to discharge retarded persons from RTCs, would result in community placements that would jeopardize the safety and well-being of discharged mentally retarded persons

with serious problems. The Court does not treat these concerns lightly. It is well aware of the fact that quality service is not yet consistently or uniformly provided persons discharged into the community. See discussion at page 16. However, having considered the procedures that will be implemented under the terms of the Settlement, the comments of numerous persons and groups concerned with the mentally retarded, and the evidence of success in placing persons in the community as described in *Pennhurst,* the Court believes that these objections do not warrant the Court's disapproval of the Settlement.

At the outset, the Court notes that the Settlement requires no more than 100 of 550 persons with severe problems to be discharged. Further, no time limit is set for when these discharges must take place. Accordingly, it appears entirely possible for placements in the community to be tailored to meet the individual needs of each person placed. There is substantial evidence that community placements are beneficial to mentally retarded persons with severe problems and that persons discharged into the community have been very satisfied with their placement. Relatives and service providers of mentally retarded persons, with severe problems residing in the community, indicated in comments to the Court, that community placements significantly enhanced the ability of such persons to develop skills. *See Welsch v. Gardebring,* Civ. No. 4–71–451, Docket VII 5, 21, 64, 75 (D.Minn. filed 1972). Numerous groups representing the mentally retarded, and professionals in the field of mental retardation, presented their opinions to the Court that community placement of mentally retarded persons with severe problems is successful. *See Id.* Docket VII 50, 53, 54, 55. Further, the Court in *Halderman v. Pennhurst* cited and discussed substantial evidence "vindicat[ing] the opinions of mental retardation experts that institutionalization cannot provide adequate habilitation ..." and showing that "transfers from Pennhurst to community living arrangements have been successfully accomplished, and have enabled [mentally retarded persons] to enjoy a bet-

ter life." *Halderman v. Pennhurst State School and Hospital,* 610 F.Supp. 1221, 1232 (D.C.Pa.1985). No comments have been addressed to the Court by the representatives of class members residing in the Community stating that such class member wants to transfer back to a state institution.

The Settlement incorporates several safeguards to ensure that persons with special needs are appropriately placed. The Department will develop a protocol to review the community services needed to safely move persons from RTCs to the community. This protocol will be used to review the community services needs of retarded persons with severe problems annually. Copies of the community needs assessments will go to the appropriate county and the Mental Retardation Division of the Department to allow planning and development of necessary services. Negotiated Settlement Part V 3, 2. The Department will also develop a protocol for the discharge planning team requiring it to consider specific factors in placing a person with special needs, including the capability of community providers and the availability of sufficient staff, to meet such person's needs. Negotiated Settlement Part V B, 7. Further, any mentally retarded person or parent or guardian, may appeal a proposed discharge pursuant to Minn.Stat. § 256.045, *amended by* 1987 Minn. Laws c. 148. For persons under the guardianship of the Commissioner, the Commissioner will promptly review and respond to requests to initiate appeals.

■ Under state law, parents who are not guardians of their adult children have no right to veto a proposed discharge. *See* Minn. Stat. § 252A11; subd. 1 (1986). Mr. Heckt requests the Court to modify the Settlement to allow such parents a right to veto a proposed discharge. As stated above, the Court cannot rewrite the terms of the agreement. The Court finds, however, that persons such as Mr. Heckt are not without some means to influence decisions made regarding their adult child. For those parents of mentally retarded adults who want a limited right of veto,

they have an option to serve as guardian for their mentally retarded son or daughter. 1987 Minn. Laws 185, §§ 31 and 13. Alternatively, family members may be involved as advocates in the interdisciplinary team meeting to discuss the discharge plan. Minn.Stat. § 253B.16, subd. 2 (1986). If parents are dissatisfied with a discharge decision, they may participate in an appeal of the decision. 1987 Minn. Laws c. 148. Parents can also make their views known to a county case manager concerning their adult child's well-being. 1987 Minn. Laws 305, § 2. And of course, persons who want control over the discharge process without assuming guardianship of their adult child can seek legislative change. With these avenues open, and in light of the safeguards assuring adequate placements for those discharged, the Court believes that, although parents do not have final control over a discharge decision concerning their adult child, the Negotiated Settlement is reasonable.

D. Extent of Discovery Completed and the State of the Proceedings

The extent of discovery completed and the stage of the proceedings are important factors to consider in determining the fairness, adequacy, and reasonableness of the Settlement because they are indicative of the Court's and counsels' ability to evaluate the merits of plaintiffs' claims. *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 *cert. denied* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (4th Cir.1975). With an accurate evaluation of plaintiffs' claims, the Court and counsel can assess the reasonableness of the terms of the Settlement.

Since the Consent Decree was entered in 1980, plaintiffs have generated volumes of reports and documents identifying areas where the Department allegedly has not complied with the 1980 Consent Decree. The parties have litigated numerous issues relevant to the Department's compliance with the Decree. Clearly, both sides are intimately familiar with the factual and legal issues in this case. Thus, although there are still substantial uncertainties as to the resolution of several legal and factual issues in this action, *see* Discussion at p.

1289–93, the Court believes that each party identified the strengths and weaknesses of its case and was able to negotiate the terms of the Settlement with due regard to the risks, expense, and delay involved in litigation. The Court believes that in light of its ongoing involvement in this action since 1980, it too was able to assess the merits of the Settlement in light of the risk, expense and delay involved in litigation. The ability of both the parties and the Court to assess the reasonableness of the Settlement supports the Court's approval of the Settlement.

### III. CONCLUSION

The Court has fully considered this case, the opinions of class members, their representatives, and counsel, and has assessed the benefits of the Settlement to plaintiffs in light of the risks, expense, and delay of litigation. Based on this, and on the fact that the Court will maintain jurisdiction of this case until it is convinced that the Department has completed its obligations, the Court believes that the Negotiated Settlement is a fair, reasonable, and adequate resolution of the dispute between the parties.

Based on the above, the arguments of counsel, the comments of class members or their representatives, the proceedings herein, and the entire record, the Negotiated Settlement is approved. Accordingly,

IT IS HEREBY ORDERED that the Negotiated Settlement is approved.

### SUPPLEMENTAL ORDER

This Court, by an Order dated July 31, 1987, approved the Negotiated Settlement which had been entered into by the parties to this action on April 14, 1987.

In the period of time between the date the Negotiated Settlement was signed (April 14, 1987) and the date the Order was signed (July 31, 1987), certain of the conditions specified in the Negotiated Settlement had been met, making some provisions of the Settlement obsolete:

a. The appeals legislation contemplated by section III of the Negotiated Settlement

had passed and the implementing bulletin had been drafted. With the signing of this Court's Order approving the Settlement, a new appeals mechanism replaced the interim compliance proceedings of section II of the Negotiated Settlement. Thus sections II and III have no further effect.

b. Legislation had passed confirming county responsibility to provide day training and habilitation services for mentally retarded persons in accordance with an individual service plan established pursuant to Minn. Rules pt. 9525.0075. The parties had agreed in the Negotiated Settlement to request an order deleting section XI of the Settlement, in the event that such legislation passed. At the hearing on June 5, 1987, the parties informed the Court that the conditions set forth in section XI had been met and requested an order which did not incorporate the provisions of section XI of the Negotiated Settlement.

The parties had further agreed, in section IV of the Negotiated Settlement, that there would be included in any Order approving the Settlement, a provision vacating the 1980 Consent Decree, except to the extent necessary to enforce sections II and XI of the Settlement. Since all the conditions of sections II and XI have been met, the parties request that the 1980 Consent Decree be vacated.

At the time of the hearing on June 5, 1987, the parties had also requested this Court to dismiss any motions pending under the 1980 Consent Decree and to vacate all prior orders of the Court which placed any ongoing obligations on the defendants. The parties agreed that the terms of the Negotiated Settlement were intended to supplant all prior obligations of the defendants in this action, and to resolve any pending motions.

The Court has reviewed the Negotiated Settlement again and considered counsels' request for the relief described above, and for an order incorporating the provisions of the Settlement which address access for counsel for plaintiffs.

NOW THEREFORE IT IS ORDERED:

1. Section XI is hereby deleted from the Negotiated Settlement. Sections II, III, and IV have been fully satisfied and have no continuing effect.

2. The balance of the Negotiated Settlement has been approved by the Court and replaces the Consent Decree entered into on September 15, 1980. That Consent Decree is vacated.

3. Any motion pending under the 1980 Consent Decree is hereby dismissed.

4. All orders of this Court issued prior to or pursuant to the 1980 Consent Decree which place any ongoing obligations on the defendants are hereby vacated.

5. The commissioner shall take necessary action to ensure reasonable access for counsel for the plaintiffs and other persons with their written authorization to the buildings and grounds of, and pertinent records of persons with mental retardation at, the regional treatment centers and state operated community facilities, for the purpose of observation and examination and, with respect to those persons under state guardianship residing at regional treatment centers or state operated community facilities, to case management records. This is not intended to limit in any way any right of access which counsel for the plaintiffs may have under any other provision of state or federal law, rule, or regulation.

6. This Court will retain jurisdiction over this action for purposes of enforcing the Negotiated Settlement.